ESTHER GELLMAN, Respondent, v. METROPOLITAN LIFE INSURANCE COMPANY, Appellant.

First Department, April 12, 1935.

*William B. Moore* of counsel [*Edward T. Post* with him on the brief; *Tanner, Sillcocks & Friend*, attorneys], for the appellant.

*Leo H. Klugherz* of counsel [*William J. Vitale* with him on the brief; *Albert H. Vitale*, attorney], for the respondent.

MERRELL, J. Plaintiff brought this action upon a policy of life insurance issued by defendant on July 16, 1926, to one Max Gellman. The plaintiff, the wife of the insured, was designated in

the policy as beneficiary. Under the provisions of the policy, " upon receipt of due proof of the death of the Insured " and upon presentation of the policy for indorsement, the defendant insurance company agreed to pay to the beneficiary the sum of $150, and thereafter an income of $150 per month for 119 months. The complaint alleges that the insured died on August 21, 1932, from drowning. Judgment is demanded against the defendant for ten monthly income payments of $150 each, falling due from the date of the alleged death of the assured to and including June 27, 1933. At the end of plaintiff's case counsel for the defendant moved to dismiss the complaint on the ground that the plaintiff had failed to make out a cause of action against the defendant. Decision was reserved by the court on such motion of defendant's counsel. At the end of the whole case counsel for defendant renewed such motion to dismiss the complaint, and that a verdict be directed in favor of the defendant. The court reserved decision on such motion. On the rendition of the verdict of the jury in plaintiff's favor counsel for the defendant moved to set aside the verdict on the usual grounds. The decision of such motion was also reserved by the court. Approximately five months later the court made an order denying the motion to set aside the verdict and wrote an opinion.

We are of the opinion that the trial court would have been justified in dismissing the complaint at the close of the plaintiff's case for failure of proof, and that, with all the evidence in, the court would have been fully justified in directing a verdict in favor of the defendant. In any event, we are of the opinion that the verdict of the jury in favor of the plaintiff was grossly against the weight of the evidence at the trial. We think the plaintiff failed to establish, by sufficient proofs, that the assured died as the result of drowning on August 21, 1932, and that there was no sufficient evidence adduced at the trial justifying the jury in finding that the assured was dead.

The plaintiff, at the trial, attempted to show the death of the assured as alleged in the complaint through the testimony of a single witness, one James Barry, the proprietor of a dog and cat hospital and pet shop combined, at 4194 Park avenue in the city of New York. Barry testified that he had had a passing acquaintance with the assured for about two years prior to the latter's disappearance. Barry testified that on Sunday, August 21, 1932, pursuant to an appointment made the day before, he called with his automobile at the home of the assured and drove with him down to Rockaway Beach; that when they arrived, a friend of Barry's loaned the assured a bathing suit, and Barry and the assured went to the

bathing beach to take a bath and that neither of them could swim; that they arrived at the beach at a quarter to three o'clock in the afternoon; that the day was a fine one and warm. Barry testified that after they entered the water, the witness was about up to his waist in the water and the assured was about ten or twelve feet distant, with the water about up to his shoulders, and that, as they were in that position, a big wave came along and passed entirely over the assured. Barry testified that to meet the wave he turned his back to the outcoming wave and to the assured, and that when he looked around the assured was not in sight. Barry testified that he immediately instituted a search for Gellman, the assured, but could find nothing of him; that he looked around for two or three minutes, and then went out where a lifeguard was stationed about 300 feet distant, and that Barry and the lifeguard then returned, the lifeguard swimming around for about two minutes searching for the assured. Barry testified further that, being unable to find the assured, he then looked on the beach for him and under the boardwalk, where he thought possibly the assured might have gone to sleep. Barry was asked: " Q. You looked under the boardwalk, you thought he might be asleep under there? A. That would be possible." Barry further testified that he looked around among the people on the beach, and then went to the house where they had disrobed prior to entering the water, to see if the assured was there. At the request of the attorney for plaintiff, Barry verified an affidavit on September 14, 1932, wherein he stated that he saw Gellman enter the water, and after he had reached a point where the water was just about up to his chin, a wave swept over him, and that that was the last he saw of him. In his affidavit he stated: " I made inquiries around, but was unable to obtain any clue as to what had become of his body. I thereupon went to the house from which he had bathed, and found his clothes were still there. * * * From what I saw, I concluded that Max Gellman had been drowned."

Some time after making such affidavit at the request of plaintiff's attorney, Barry made overtures to the defendant insurance company, offering to produce the assured upon payment of a consideration. Barry admitted that, in talking with an adjuster for the defendant insurance company, he told the adjuster that he thought he had seen the assured since his disappearance on August 21, 1932. Barry admitted that at either Mamaroneck or Port Chester, as he was riding in an automobile along the street, he had seen a man that he thought was Gellman, the assured. According to Barry's testimony, he had had some former connection with a detective by the name of Scaffa, who was the head of a detective agency

in charge of big jewelry robberies. Barry testified that, after seeing the man that he thought was Gellman on the street at Mamaroneck or Port Chester, he called upon Scaffa and told him how the case happened and how the body of Gellman was not found, and that Scaffa then called up Mr. Tiscornia, an adjuster for the defendant insurance company. On cross-examination Barry admitted that, before he went to see Scaffa, he had seen somebody, either at Mamaroneck or Port Chester, that, at least, he thought was Gellman, the assured. Barry testified that he explained the case to Scaffa, how it happened the body of the assured was not found, and also told him about seeing a party that he thought was the assured at Mamaroneck, and that thereupon Scaffa called up Tiscornia, that a meeting was arranged, at which Scaffa, Barry and Tiscornia were present, and, on cross-examination, Barry admitted that he told Tiscornia that, if the company was agreeable for him to investigate, he would, and that he " wouldn't charge them five cents," unless he produced the man, Gellman. Barry was asked: " Q. Now, as a matter of fact you had seen him, had you not. A. I wasn't sure, sir, I didn't say I was sure."

On redirect examination Barry was asked the following question: " Q. Plaintiff's Exhibit 4 in evidence [Barry's affidavit above referred to], the information contained in the affidavit signed by you and sworn to before a notary public on September 14th, 1932, was the truth then and still is the truth, is that right Mr. Barry? A. It was the truth what I signed, as far as I know at that time."

In further cross-examination Barry was asked by counsel for defendant: " Q. The question is, is that true now? A. I could not truthfully answer that question.

" Q. Your mind has changed, has it not, since you made this affidavit about whether or not Gellman was drowned? * * * A. I am in doubt now. * * *

" Q. I say your mind has changed to this extent, that subsequent to making this affidavit, Plaintiff's Exhibit 4, you saw something or saw some man that prompted you to come to the defendant company and offered to turn up Gellman and be paid for it? A. Yes.

" Q. Isn't it a fact at the present time, Mr. Barry, you don't know whether or not Gellman was drowned? A. I do not."

The record on appeal thus discloses the very slight and unsatisfactory evidence of the death of the assured that was submitted to the consideration of the jury. The sole witness attempting to show the death of the assured was the witness Barry, who gave most unconvincing testimony showing the death by drowning on August 21, 1932, as claimed by plaintiff

On the part of the defendant, as against the weak case made by plaintiff, the defendant first swore as a witness one Morris Pickoff, engaged in the jewelry business for twenty-five years. Pickoff testified that he knew Max Gellman, and the latter had been employed by him in 1929 as his jewelry salesman in Pickoff's store. Pickoff testified that he had been acquainted with Gellman, the assured, for about twenty years, and was a fellow-member with the assured of the Jewelers' Benevolent Society. Pickoff further testified that he heard of the disappearance and purported drowning of the assured in August, 1932, and that in 1933, as he was about to enter an Odd Fellows' lodge, and as he was standing on the corner of Sixth street and Second avenue, he saw two men passing, one of whom looked to him like Gellman, the assured, but who, at that time had a heavy beard and mustache. As Pickoff was waiting for some of his brother Odd Fellows to appear, one Isidor Kiersh, also an Odd Fellow, approached, and Pickoff had a conversation with Kiersh, and the latter stated: " Well, I got to see him," and that he saw Kiersh cross the street and pass by, face to face, the man whom Pickoff thought was the assured. Pickoff stated that when he saw the man he took to be Gellman, he looked at him pretty good; that he had known him for many years, and that, by reason of the mustache and beard, he could not say exactly it was he. Pickoff testified that later on he had told a representative of the New York Life that he had seen Gellman.

Kiersh, at the trial, testified that he had known the assured, Gellman, for about four years, and that they worked together as salesmen in the Pickoff jewelry establishment for about two years. Kiersh testified that in June or July, 1933, between seven and eight o'clock in the evening, as he was about to enter the Odd Fellows meeting room with Pickoff, he had a conversation with the latter, and then proceeded to follow two men, one of whom looked to him to be Gellman. The witness Kiersh testified: " It was Thursday night, I was going to lodge meeting, Odd Fellows, on 6th Street and Second Avenue. It was kind of early, we were waiting outside in front of the meeting rooms, Mr. Pickoff came along and said he just saw Gellman." Kiersh further testified that, after talking with Pickoff: " I walked into 6th Street across Third Avenue and I took a look at Gellman and I saw it was him." Kiersh testified positively that he recognized the person he saw as Gellman, the assured. Kiersh could not be shaken from his positive testimony that he saw Gellman on the occasion mentioned. He testified that he crossed the street, and met Gellman on the sidewalk, and was " right next to him. Q. How far? A. Right close to me. I walked him by. Right next to me. It was on the same sidewalk."

Kiersh testified that he stopped a moment, and that Gellman and his companion were walking slowly, and that he had a good look at him.

Anthony V. Tiscornia, sworn as a witness for defendant, testified that he was an investigator for the defendant Metropolitan Life Insurance Company, and had been for thirty-nine years. He testified further that he had a talk with Barry on March 24, 1933, concerning the assured, Max Gellman. He testified: "Why, Mr. Barry told me that he understood that the Metropolitan Life Insurance Company was about to be sued for a large amount of money on an insurance policy on the life of a man that was supposed to have drowned by the name of Max Gellman, and that he had reason to believe that he could locate the man. So I said, 'Well, we will be very much interested.' So when I found out who the gentleman was that I had met in this office was the same man that had made an affidavit that he had seen the man drown I asked him what made him change his mind from the time when he made this affidavit, and found out there had been a hold-up at his place in New Jersey and that from some correspondence that he had received he had every reason to believe that he could locate Gellman through that correspondence." Tiscornia further testified that on May twenty-fifth he dropped in at Barry's place of business, at 4194 Park avenue, to find out if anything new had developed from the time he spoke to him, and during the conversation that he asked Barry when he saw him and where, and that Barry then told him that he saw Gellman at Port Chester.

It clearly appears from the testimony in this case that there was no sufficient testimony before the jury justifying the verdict rendered, and that the jury's verdict was grossly against the weight of the credible testimony given at the trial, that the assured came to his death from drowning on August 21, 1932. The testimony of Barry as to what was done in an effort to discover the assured at the beach and his effort to ascertain whether the assured was sleeping under the boardwalk or upon the beach, throws much doubt upon Barry's original sworn statement, that from what he saw he concluded that Max Gellman had been drowned. The further fact that Barry believed he had seen Gellman alive some time after he thought he had been drowned, and his efforts to interest the insurance company to pay him a consideration for producing Gellman, all tend to weaken, if not destroy, any testimony given by Barry at the trial showing the death of Gellman by drowning. The verdict of the jury was so contrary to the weight of the testimony in the case that the court should have set aside the verdict for that reason.

The order and judgment appealed from should be reversed and a new trial granted, with costs to the defendant, appellant, against the plaintiff, respondent, to abide the event.

MARTIN, P. J., and MCAVOY, J., concur; O'MALLEY and UNTERMYER, JJ., dissent and vote for affirmance.

O'MALLEY, J. (dissenting). If the view of the evidence taken by Mr. Justice MERRELL is justified, there was failure of proof and the complaint should have been dismissed. A new trial, therefore, should not be granted. In my view the finding that due proof of death was presented was fully warranted. In considering this question we are more concerned with the events of August 21, 1932, than with subsequent events.

At the outset it is to be observed that the insured was living happily with his wife and two children, one thirteen and the other fourteen years of age. Temporarily, his wife and children were at Bethlehem, N. H., for the summer, where the insured had sent them for their vacation and where his wife was engaged in conducting a boarding house. There is no evidence tending to show that the insured or his family were in financial straits, nor anything to reflect upon his good name or character.

August twenty-first was a Sunday. The weather was hot and it was not unnatural or unreasonable that the insured should have gone to the ocean beach with thousands of his fellow-citizens. He was accompanied by Barry and a friend, Nathan Feinberg. When they arrived at the beach all went to a bungalow owned by Milton Feinberg, where Nathan Feinberg intended " to call for " his wife and two children.

Barry and the insured put on their bathing suits at the bungalow and went together to the beach. Neither could swim. The ocean was very rough. They were not bathing between the ropes which afforded protection, but at a point on the beach separated by a pile of stones from the main beach. While there were several persons on the beach at this point, few if any were in the ocean except Barry and the insured.

After the insured disappeared Barry first made a search for a few minutes and then went a distance of 300 feet to call a life guard who told Barry that they had no business to go swimming where there were no ropes. After the search of the life guard proved unsuccessful, Barry returned to the Feinberg bungalow and he was accompanied to the beach by several persons. The search was continued and was not given up until late in the evening. A

large crowd gathered. The police were notified and after coming to the beach to investigate, they went to the Feinberg bungalow, where they found the clothes of the insured including his money, a letter from his wife, and his keys. They took charge of these effects.

The insured's wife testified that she had not seen the insured since August 21, 1932, but that she visited the morgue on several occasions without being able to identify the bodies seen as that of her husband.

No proof was offered by the defendant to contradict any of these facts. No one who was present at the beach was called and no evidence was introduced tending to show that the ocean was not " very rough " as claimed by Barry. The latter at no time changed his testimony with respect to occurrences at the beach in any respect.

In attempting to cast doubt upon the likelihood that the insured was drowned, appellant's counsel urges that the latter made no outcry and that it is unreasonable to believe that his body could have disappeared under the circumstances.

I am of the opinion that the jury were fully justified in finding that it was quite possible for the body not to have been seen again, in view of the heavy sea that prevailed. It was wholly probable that the deceased was rendered unconscious and swept away by the undertow which usually prevails under such conditions.

It was not unreasonable for one, who, like Barry, had witnessed a scene of this kind, to have entertained hope that possibly the insured had not been drowned. It seems to me that the jury in passing upon the issues were well within their rights in judging Barry's subsequent acts in this light. It is to be borne in mind, too, that he at no time said that he had seen the insured, but had thought he had seen him. So, too, at no time did he state to the representative of the defendant that he could find and produce the insured, but that rather he hoped to be able to do so.

The jury had a right to wholly disregard the testimony of the witnesses, Pickoff and Kiersh. Both testified that the man they saw wore a beard and mustache. Pickoff was unable to say he was the insured. He further testified that the man at the time wore no hat. Kiersh, while testifying that the man they saw was the insured, said that he wore a hat which was down over his eyes. It is significant that Kiersh, notwithstanding the fact that he claims to have identified the insured, did not approach him at the time and inquire why he did not return to his home, and why he was masquerading in such a disguise. The jury had a right to find that these witnesses were biased by virtue of the fact that the wife of

the insured applied for death benefits to the lodge of which the insured and the witnesses were members.

In my judgment a reversal of this judgment would be unjust, and I, therefore, vote to affirm.

UNTERMYER, J., concurs.

Judgment and order reversed and a new trial ordered, with costs to the appellant to abide the event.